```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

UNITED STATES OF AMERICA              :

                                      :
        -v.-
                                      :         23 CR 503 (PMH)
TRAVIS SINCLAIR,
                                      :
        Defendant.
                                      :
------------------------------------------------------------ X
```

**SENTENCING MEMORANDUM FOR THE DEFENDANT TRAVIS SINCLAIR**

Margaret M. Shalley, Esq.
Counsel for Travis Sinclair
Margaret M. Shalley & Associates, LLC
225 Broadway, Suite 715
New York, New York 10007
(917) 841-0231

# MARGARET M. SHALLEY, ESQ.

MARGARET M. SHALLEY & ASSOCIATES, LLC
225 Broadway, Suite 715
New York, NY 10007
917-841-0231 (Phone)
212-566-8165 (Fax)
margaretshalley@aol.com

September 9, 2024

<u>**VIA ECF**</u>
The Honorable Philip M. Halpern
United States District Court Judge
Southern District of New York
300 Quarropas St.
White Plains, NY 10601

Re:   *United States v. Travis Sinclair*,
       **23 CR 503 (PMH)**

Dear Judge Halpern:

This letter is respectfully submitted pursuant to Rule 32 of the Federal Rules of Criminal Procedure and sets forth several matters that Mr. Sinclair will raise to aid in the determination of an appropriate sentence, serving the interests of justice and sentencing goals of 18 U.S.C. § 3553(a). Mr. Sinclair was arrested on November 3, 2022 and has been detained since that date. On November 29, 2023, Mr. Sinclair appeared before Your Honor and pleaded guilty pursuant to a plea agreement to Count 1, Hobbs Act Robbery, in violation of 18 U.S.C. § 1951. As a result of Mr. Sinclair's background and personal characteristics, it is respectfully requested that the Court sentence him to 144 months imprisonment, as recommended by Probation.

## **BACKGROUND**

It was dark outside. 18-year-old Travis Sinclair is huddled on the stairwell outside of his sister's apartment. She had just kicked him out and kept his I.D., passport and clothes. He didn't have a coat or anywhere to go. He had no money or food. Having been in the United States for a short time, Mr. Sinclair was lost and alone. He was not used to the weather and was so cold he was shaking. He began sleeping in the stairwell and his sister, her husband and their children would step over him as he slept, ensuring that he remained locked out of the home.

Travis Sinclair was born into extreme poverty on August 25, 1996, in Kingston, Jamaica.[1] He lived in a dangerous neighborhood and his father was shot and killed while sleeping when Mr. Sinclair was two years old.[2] Mr. Sinclair believes that his father was killed as a result of his

---
[1] PSR ¶ 45.
[2] *Id*.

1

political affiliation and although the family knows who killed him, no legal action was ever taken.[3] Soon after his father was killed, Mr. Sinclair's five year old brother was shot and killed to prevent future reprisal for the killing of his father.[4] Eventually, Mr. Sinclair's 28 year old brother was hunted, shot and killed. Jamaica has one of the highest murder rates in the world.[5] The violence in Jamaica that Mr. Sinclair witnessed on a daily basis and took the lives of his family is truly astounding.

Mr. Sinclair's mother worked as a babysitter and would make and sell fresh fruit juice.[6] She struggled to make ends meet and to provide for her four surviving children. The home that Mr. Sinclair grew up in had no running water or electricity.[7] There was not enough food to feed everyone and Mr. Sinclair would go to bed hungry.[8] He routinely searched garbage cans for scraps of food and sometimes survived on just water and sugar. In addition to the financial struggles the family faced, Mr. Sinclair began experiencing physical and emotional abuse from his stepfather beginning soon after his biological father died. In an effort to provide and support her family, Mr. Sinclair's mother married Kelvin McCloud when Mr. Sinclair was two years old.[9] She thought it would be helpful to have another adult in the home and believed that a male figure would be beneficial to her children. However, Mr. McCloud quickly began taking his anger out on Mr. Sinclair and his mother. Mr. McCloud would beat them and would force Travis to lay under his bed for hours at a time as punishment.[10] Mr. McCloud stripped Travis naked and beat him about the head and body with household objects. Mr. Sinclair has often been told that he looks just like his father and he believes this is why Mr. McCloud abused him.[11]

Travis sought refuge from the abuse at school. Mr. Sinclair attended school in Jamaica until he was in 9th grade.[12] However, he was often ridiculed and bullied by the other children because of his old and torn clothes and his lack of shoes. While in school, Mr. Sinclair began using marijuana. He first began smoking marijuana when he was 11 years old and by the time he was 14, his use had increased and he was smoking daily.[13] Travis found that marijuana helped to calm him and push the emotional trauma from the abuse he was experiencing to the back of his mind. When he was in 9th grade, his mother got very sick and Mr. Sinclair was forced to drop out

---

[3] *Id*.
[4] PSR ¶ 47.
[5] According to Reuters, Jamaica's homicide rate in 2020 was 47.7 individuals per 100,000 inhabitants, which Reuters calculates gives it the highest murder rate. https://www.reuters.com/world/americas/jamaica-gang-trial-tests-new-anti-crime-laws-amid-wave-violence-2022-02-14/. Jamaica's own police commissioner categorizes Jamaica's homicide rate as one of the world's top five. See https://www.jamaicaobserver.com/latest-news/jamaica-plagued-by-a-persistent-epidemic-of-violence-says-anderson/. As of November 12, 2021, there were 1,240 murders recorded in the country and 1,100 people who were shot and injured but survived. *Id*.
[6] PSR ¶ 46.
[7] PSR ¶ 48.
[8] *Id*.
[9] *Id*.
[10] *Id*.
[11] *Id*.
[12] PSR ¶ 71.
[13] PSR ¶ 68.

to care for her.[14] He also began working, cleaning gutters and houses and taking any odd job he could in order to assist his family financially.[15]

When Mr. Sinclair was 18 years old, his family had saved enough money to send him to the United States to live with his sister, Kayden Myrie, in Mount Vernon.[16] No males in his family have ever lived beyond the age of 30 and the same rivals who killed his father and brother had previously made attempts to kill him.[17] His mother sent him to the United States for his safety. The first time he wore shoes was on his trip to the United States. It took Mr. Sinclair a while to adjust to live in New York.[18] The U.S. was not what he was expecting and the culture shock that he experienced was great. He was fortunate to have his sister to guide him. However, while he was living with his sister, her 15-year-old son had been residing in Jamaica with Mr. Sinclair's mother.[19] His mother had contacted his sister, stating that her son had been misbehaving and that he could no longer reside in Jamaia with her.[20] Mr. Sinclair's sister stated that if her son could no longer live in Jamaica, then Mr. Sinclair could no longer live with her and she then asked Mr. Sinclair to leave.[21] When he did not, she called the police, who removed him from the house.[22] Mr. Sinclair was homeless, destitute and his sister kept his passport and clothing.

Eighteen years old, and without a familial support network Travis quickly linked up with fellow Jamaican youth in his neighborhood to survive. At the time, those individuals were the only people Mr. Sinclair knew and he had nowhere else to go. His association with these individuals led to his first federal arrest. Mr. Sinclair was released from incarceration on August 5, 2022. Upon his release, Mr. Sinclair was supposed to live with his sister-in-law; however, she did not permit him to do so.[23] Again, with no where to go, Mr. Sinclair sought out one of the individuals he knew prior to his first arrest, Kently Thomas, and began residing with him.[24]

While Mr. Sinclair was incarcerated on his prior case, his 28-year-old sister died from complications of diabetes and his mother became very ill from the same disease. His mother suffered from hypertension, diabetes, and had her foot and toes amputated.[25] Following his release, Mr. Sinclair was able to speak to his mother on a video call, and a few days later she died.[26] Mr. Sinclair always had a good relationship with his mother and he regrets that he was not able to spend time with her prior to her death. The loss of his mother was difficult for him and he had trouble re-integrating himself back into society, but also with dealing with his emotions following the death of his mother and sister.

---

[14] PSR ¶ 71.
[15] PSR ¶ 75.
[16] PSR ¶¶ 49, 50.
[17] PSR ¶ 49.
[18] PSR ¶ 50.
[19] *Id*.
[20] *Id*.
[21] *Id*.
[22] *Id*.
[23] PSR ¶ 52.
[24] *Id*.
[25] PSR ¶ 46.
[26] *Id*.

3

Throughout his life, Mr. Sinclair has suffered from numerous mental and physical health problems as a result of his upbringing. He has been diagnosed with depression, psychophysiological insomnia, anxiety disorder, substance dependence, adult psychological abuse, victim of crime and terrorism, unspecified child maltreatment, bipolar disorder and obesity.[27] Although he has been prescribed medication to treat his mental health conditions, he has only been able to receive the medication while incarcerated. When he was released from prison, he was unable to obtain Medicaid and as a result, could not continue his mental health treatment or treatment for his uncontrolled diabetes and hypertension.

Mr. Sinclair is a warm, respectful individual who aspires to start a new chapter and pursue a life of meaning and value. He has repeatedly expressed that he is now ready to embrace responsibility and take control of his own life and future. He had a difficult childhood, fraught with trauma and loss, and had difficulty transitioning into adulthood and to a new lifestyle and culture in the United States. Mr. Sinclair is apologetic to the Court and to the victims of this offense for his actions and is determined to better himself while incarcerated so that he can become a productive member of society upon his release.

## **THE APPROPRIATE SENTENCE**

The Court is required to consider the factors set forth in Title 18 U.S.C. § 3553(a) and to impose a sentence that is both reasonable and "sufficient, but not greater than necessary, to comply with the purposes" reflected by the subsections of § 3553(a). After a review of Mr. Sinclair's life and circumstances, a sentence of 144 months imprisonment is appropriate, reasonable, and thus warranted in this case.

Pursuant to the plea agreement, the Government and Mr. Sinclair agree that, in connection with his guilty plea, Mr. Sinclair agreed to admit to Specification #2 of the supervised release violation pending in *U.S. v. Travis Sinclair*, 19 CR 137 (KMK). Additionally, pursuant to U.S.S.G. § 2B3.1, the base offense level for Count 1 is 20. Seven levels are added because a firearm was discharged in the commission of the offense, pursuant to U.S.S.G. § 2B3.1(b)(2)(A). After a two level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), and an additional one level decrease pursuant to U.S.S.G. § 3E1.1(b), Mr. Sinclair's applicable Guidelines offense level is 24. Based on Mr. Sinclair's criminal history, he is in Criminal History Category II, resulting in a stipulated Guidelines range of 57 to 71 months imprisonment. However, pursuant to the plea agreement, the parties have agreed not to seek a sentence outside the range of 12 to 15 years imprisonment. Notably, the co-defendants were sentenced to 18 and 21 months respectively for the same offense.

**1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1));**

Mr. Sinclair pleaded guilty and accepts full responsibility for the poor decisions he made. After considering Mr. Sinclair's background and characteristics, it is clear that a sentence of 144 months imprisonment would be "sufficient, but not greater than necessary" to comply with the sentencing goals of 18 U.S.C. § 3553(a)(2).

---

[27] PSR ¶ 67.

By the time he was two years old, Mr. Sinclair had lost his father and his brother. Although at the time he was too young to grasp the severity of the situation, when he looks back on his life, Mr. Sinclair understands that he suffered intense emotional trauma as a result of the murders. Approximately five percent of young people lose a parent before reaching adulthood.[28] Early parental loss is associated with negative outcomes including, anxiety, depression, negative effects of sense of self, and substance abuse.[29] A number of psychological symptoms, most prominently neurosis and depression, appear to correlate with parental or sibling death.[30] Studies have shown that children who have lost a parent of a sibling have continuing emotional distress.[31] This epitomizes Mr. Sinclair and the effect that the loss of his father and brother have had on his life.

Just days after being released on his prior case, Mr. Sinclair's mother died. This was extremely difficult for him and he had a difficult time grieving. He had just been released after being in prison for four years and he was trying to transition back to civilian life, all while dealing with the loss of his mother. Mr. Sinclair was not able to properly mourn his mother because he was desperately seeking help and resources to succeed in his new community. He was ineligible for SNAP and Medicaid and he kept asking people around him for help but no one seemed willing or able to assist him. The attorney on his prior case believed he would be in immigration custody when released so no re-entry plan was prepared for him and as a result, he was left on his own with no money, ID, or clothes. Mr. Sinclair had no where to turn and began living with individuals who he knew previously.

With nowhere to go, no one to help him and no mental health medication, Mr. Sinclair was having trouble focusing on his future. Instead, Travis was weighed down by his depression and feelings of hopelessness and turned to the individuals around him as support. Unfortunately, this resulted in him committing the instant offense and being violated on his prior case. Mr. Sinclair is furious with himself that he was not able to move past his prior mistakes and instead put himself in his current situation.

Mr. Sinclair's personal history and characteristics paved the way for his involvement in the instant offense. While his background in no way excuses his involvement, nor in any way diminishes its seriousness, it does render his actions all the more understandable and provides mitigation in determining an appropriate sentence that serves the ends of justice. Mr. Sinclair has suffered many losses in his life and his support system in the United States was non-existent. Throughout his life, he has yearned for social connection which resulted in him becoming involved with unsavory individuals. He is remorseful for his actions and has taken responsibility by pleading guilty.

---

[28] Grant Hilary Brenner MD, DFAPA, *How Losing a Parent Affects Young Children*, Psychology Today (Feb. 22, 2022) https://www.psychologytoday.com/us/blog/experimentations/202202/how-losing-a-parent-affects-young-children#:~:text=The%20typically%20chaotic%20experience%20following,or%20escape%20unrelenting%20psychic%20pain).
[29] *Id*.
[30] Institute of Medicine (US) Committee for the Study of Health Consequences of the Stress of Bereavement; Osterweis M, Solomon F, Green M, editors. Washington (DC): National Academies Press (US); 1984.
[31] *Id*.

5

**2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(A)-(C));**

Mr. Sinclair appreciates the serious nature of his crimes and is remorseful for his conduct. Sentencing Mr. Sinclair to 144 months imprisonment provides sufficient punishment for the offense and protects the public from further crimes of the defendant. Since his arrest and incarceration in this matter, Mr. Sinclair's perspective has changed immensely. He has dedicated himself to treatment and understands that the mistakes he has made in his past that have led him to his current situation are a result of his upbringing and lack of a strong role model. Mr. Sinclair believes that if he sticks to his treatment, and continues to educate himself while in prison and learn a manual skill, that he will be able to overcome his past. Since his incarceration in this matter, Mr. Sinclair has taken GED classes and has successfully completed the math, language and social studies sections of the exam. However, he was moved to the MDC before being able to complete the science portion and has been in lockdown for the past two months in the MDC. Travis has completed numerous courses, such as Critical Thinking and Decision Making, Honest Jobs, Careers Without College, and Electricity and Fire Safety Courses, offered at the various jails he has been housed at.[32]

Recent scientific studies have shown that underdevelopment of the human brain makes young adults more susceptible to engaging in risky behavior and becoming influenced by others. Specifically, the human brain does not fully develop until age 25, and the last part of the brain to develop is the prefrontal cortex, which relates to judgment, forethought, impulse control, and other executive functions related to decision-making.[33] This explains why many young adults engage in risky behavior and fail to properly evaluate the long-term consequences of their actions the way that older adults do.[34] Now that Mr. Sinclair is older and has spent the last two years in prison, he has realized how his actions affect his future. This is evidenced by the fact that during his previous incarceration, Mr. Sinclair did not participate in any programs. During his incarceration on this case, Mr. Sinclair has taken GED courses and many BOCES and other training programs in an effort to better himself.

To be sure, Mr. Sinclair participated in a serious crime, soon after being released from prison on a prior sentence, and it is important to deter others from engaging in such conduct. With respect for the need for a sentence to afford adequate deterrence to criminal conduct, there is no evidence that any period of incarceration in this case will have any bearing on deterrence and there is no empirical data to suggest that it would. In a comprehensive study of specific deterrence, no

---

[32] Exhibit A – Certificates of Completion; During his prior federal sentence, he was housed primarily in GEO and Putnam County and neither jail had any courses for individuals while incarcerated.

[33] *See* Jesse Payne, *Change Your Brain, Change Your Life (Before 25)*, Psychology Today (August 7, 2014), https://www.psychologytoday.com/blog/the-author- speaks/201408/change-your- brain-change- your-life- 25

[34] *See* Arthur Allen, *Risky behavior by teens can be explained in part by how their brains change,* The Washington Post (September 1, 2014), https://www.washingtonpost.com/national/health-science/risky-behavior-by-teens-can-be-explained-in-part-by-how-their-brains-change/2014/08/29/28405df0-27d2-11e4-8593-da634b334390_story.html?utm_term=.b6431a16ca72

difference was found between probation and imprisonment.[35] Essentially, the study emphasizes that potential criminals are not generally aware of sentences for their particular crime, do not believe they will be apprehended or convicted, and simply do not consider criminal sentences.[36] The Court should not overlook Mr. Sinclair's positive characteristics, devotion to his family, and his commitment to treatment to send a message to others.

In addition to the sentence he receives, Mr. Sinclair is also going to suffer the collateral consequences of this conviction for the rest of his life. These consequences "serve no useful function other than to punish criminal defendants after they have completed their court-imposed sentences."[37] Most notably, Mr. Sinclair will be deported to Jamaica following his release in this case. The people who killed his father and brother are still living in Jamaica and Mr. Sinclair is fearful that when he returns, they will once again be on the lookout for him and may kill him. Additionally, Mr. Sinclair's co-defendant from his past federal case is related to the leader of the Shower Posse gang in Jamaica, a violent street gang that he believes will seek retribution. Further, Mr. Sinclair's uncle was the leader of a violent gang that controls an area of Jamaica and extorts money from business and other groups for "protection." Mr. Sinclair is fearful that he will be targeted by him.

Further, the relative harshness of Mr. Sinclair's pre-sentence confinement bears on sentencing, insofar as one of the purposes of sentencing is to afford just punishment for the offense and respect for the law. Since his arrest in this case, Mr. Sinclair has been confined in pre-trial detention at Westchester County Correction Facility, Hudson County Correction Facility, and most recently Metropolitan Detention Center in Brooklyn, jails not "designed for long term stays."[38] Even under the best of circumstances, inmates' movements are severely restricted at all times and they have little opportunity to participate in social programs, limited access to personal development programs, exercise, physical training or recreation, and almost no opportunities to be outdoors.

As Judge Gary R. Brown recently noted while sentencing a defendant in *United States v. Colucci*, sentencing defendants is a difficult and complex responsibility that has become further complicated by the "dangerous, barbaric conditions that have existed at some time at the Metropolitan Detention Center ('MDC') in Brooklyn."[39] Judge Brown imposed a 9 month sentence on a tax fraud defendant facing an advisory Guidelines range of 18-24 months based largely on the conditions of confinement at the MDC.

For the last several years, beginning with the COVID-19 pandemic, inmates have faced the

---

[35] *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). *See also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).

[36] *Id* at 28-29

[37] *US v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. May 24, 2016).

[38] *See United States v. Behr*, 2006 WL 1586563 *5 (S.D.N.Y. 2006) (Sweet, J.) (further noting that harsh conditions at MCC were recognized by Judge Kimba Wood as a basis for a substantial sentence reduction); *see also, United States v. Saldana,* 17 Cr. 512, ECF No. 535 at 16–17 (S.D.N.Y. Sept. 10, 2019) (Wood, J.) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that.").

[39] *United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857, p. 1 (E.D.N.Y. Aug. 5, 2024).

worst of conditions. However, the issues at the MDC have not been limited to the issues that resulted from the COVID-19 pandemic. The inhumane conditions and extensive lockdowns at MDC have continued despite the pandemic having subsided. And these issues continue to affect the decisions by Judges when it comes to bail and sentencing. Judge Brown cited to some of the recent cases in which judges have based their decisions on the conditions at MDC.

> In *United States v. Chavez*, contrary to statutory presumptions, Judge Furman ordered that a narcotics defendant subject to a multi-year sentence remain at liberty pending surrender, based largely on the conditions at MDC. 2024 WL 50233, at *6. In *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024), Judge Komitee granted a motion for compassionate release based primarily on the conditions at MDC for a defendant serving time for violating supervised release. *Cf. United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods."). In yet another case, Judge Cogan indicated that he might have sentenced an offender to incarceration "if not for the length of the sentence landing him in the Bureau of Prison's Metropolitan Detention Center in Brooklyn."[40]

Judge Furman, in *Chavez*, identified three areas of concern in the post-COVID conditions at MDC: "(1) continued reports of inordinate periods of lockdown, (2) claims that the facility provides inadequate and/or substantially delayed necessary medical care—a particular risk in this case and (3) general issues about the conditions at the facility."[41] There is irrefutable evidence of inadequate supervision, assaults and lack of sufficient medical care at MDC.[42]

Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition in measuring a just sentence.[43] The same logic applies here. "A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment,

---

[40] *Colucci*, 2024 WL 3643857, p. 5.

[41] *Chavez*, 2024 WL 50233, at *5

[42] *Griffin*, 2024 WL 2891686, at *3 ("it has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns, which has delayed medical care for a number of inmates").

[43] *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure, and do so in the light of this holding"); *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (noting that "[i]n imposing the sentence it did, the district court considered . . . [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Columbia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484 (LMM), 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that the defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States . . . warrant a downward departure"); *United States v. Torres*, No. 01 Cr. 1078 (LMM), 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").

incarceration in such circumstances is, unavoidably, experienced as more punishing."[44] Even pre-*Booker*, the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures,"[45] "Chaos reigns, along with uncontrolled violence" at the MDC.[46] Over the past six months, the MDC has been marred by catastrophic violence, "including two apparent homicides, two gruesome stabbings and as assault so severe that it resulted in a fractured eye socket for the victim."[47] These incidents "demonstrate a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement. And these conditions bear heavily on the determination by the Court in this case."[48]

Mr. Sinclair is hopeful that when he is deported, he will be able to start a new life for himself and will be able to stay away from the individuals who wish to harm him. He would like to start his own family and is interested in becoming a peer specialist for immigrant youth to assist young people on how to be law-abiding citizens.

---

[44] Opinion and Order at 7, *United States v. Ramon Lizardi*, 11 Cr. 1032-55 (PAE) (Oct. 9, 2020). *See also* Def. Mem. at 6; *United States v. Rodriguez*, No. 00 Cr. 761-2 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [ a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." (citation omitted)); *United States v. Salemo*, No. 11 Cr. 0065-01 (JSR), 2020 WL 2521555, at *3 (S.D.N.Y. May 17, 2020) ("noting that the BOP has taken a number of steps to mitigate the spread of the virus in federal prisons . . . [including] restrictions on visitors, restrictions on gatherings . . . [and] lockdowns lasting at least 14 days"); *United States v. Smalls*, No. 20 Cr. 126 (LTS), 2020 WL 1866034, at *2 (S.D.N.Y. Apr. 14, 2020) (noting that the "BOP has instituted a mandatory 14-day quarantine lockdown of all inmates across the BOP system").
[45] *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (per curiam), because harsh conditions of confinement could be regarded as a mitigating factor pursuant to U.S.S.G. §5K2.0. Id. (internal citation omitted.)
[46] *Colucci*, 2024 WL 3643857, p. 9; *Griffen*, 2024 WL 2891686 at *3 (describing rampant "violence and the threat of violence" at MDC.).
[47] *Colucci*, 2024 WL 3643857, p. 10.
[48] *Id*. at p. 13.

9

## **CONCLUSION**

      Mr. Sinclair understands the seriousness of his offense and is deeply apologetic for his actions and remains especially remorseful to the Court. When Mr. Sinclair's involvement in this offense is viewed against the backdrop of his personal history and characteristics, it is clear that the proposed sentence to 144 months imprisonment is both reasonable and appropriate. Mr. Sinclair respectfully reserves the right to raise additional issues at the time of sentencing. The Court's time and consideration of this submission are greatly appreciated.

                                                   Respectfully submitted,

                                                             /s/

                                                   Margaret M. Shalley

cc:     AUSA Stephanie Simon
         AUSA Benjamin Klein
         (*via ECF*)